UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LORI TRAVERS,                                    :

                   Plaintiff,                :          10 Civ. 8228 (PGG)(AJP)

          -against-                       :          **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE, Commissioner of               :
Social Security,
                             :

               Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Paul G. Gardephe, United States District Judge:**

Pro se plaintiff Lori Travers brings this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (Dkt. No. 2: Compl.) The Commissioner has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. No. 11: Notice of Motion; <u>see also</u> Dkt. No. 12: Comm'r Br.)

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings should be <u>GRANTED</u>.

<u>FACTS</u>

**<u>Procedural Background</u>**

On September 12, 2008, Travers filed for DIB and SSI. (<u>See</u> Dkt. No. 8: Administrative Record filed by the Commissioner ["R."] 82-90, 91-97.) Her application alleged that

she was disabled since May 2, 2008 due to sixty percent hearing loss in her right ear and "mild" hearing loss in her left ear.  (R. 82, 91, 109-10.)  On December 5, 2008, the Social Security Administration denied both claims, finding Travers not disabled.  (R. 42-50.)  On January 7, 2009, Travers requested an administrative hearing.  (See R. 9, 51-52.)

Administrative Law Judge ("ALJ") Vivian W. Mittleman conducted a hearing on March 23, 2010, at which Travers, without counsel, testified via video conference.  (R. 21-39, 81.) On April 21, 2010, ALJ Mittleman issued a written decision finding Travers not disabled.  (R. 6-17.) ALJ Mittleman's decision became the Commissioner's final decision when the Appeals Council denied review on October 13, 2010.  (R. 1-3.)

On October 21, 2010, Travers filed this action claiming that the ALJ's decision was "erroneous, not supported by substantial evidence on the record, and/or contrary to the law."  (Dkt. No. 2: Compl. ¶ 9.)

The issue before the Court is whether the Commissioner's decision that Travers was not disabled between May 2, 2008 and April 21, 2010 is supported by substantial evidence.

**Non-Medical Evidence**

Travers was born on July 19, 1973 and was thirty-four years old at the alleged onset of her disability.  (R. 27, 82, 91, 106, 133.)  Travers graduated high school and also obtained a certificate of completion for a medical billing and office administration course.  (R. 28, 114.) Travers worked as a medical secretary from 1993 to May 2008, working only part-time after 2002. (R. 28, 110, 126, 146.)  Travers "answered phones, greeted and processed paperwork for patients, filed charts, scheduled appointments and lab tests, and contacted insurance companies for collection

of payments."  (R. 111, 127-29.)[1]  During her eight-hour work day, Travers stood or walked for seven hours and sat for one hour.  (R. 110-11, 127-29.)

Due to Lyme disease, Travers' hearing in her right ear was "almost gone" and hearing in her left ear was "faded" and "still maybe dropping."  (R. 29-30, 109.)[2]  As a result, Travers was unable to perform her job because she could not "hear well and ha[d] difficult[y] understanding when spoken to[]."  (R. 28, 32, 110.)  Travers further explained that she "could not perform well due to [her] frustration of not being able to hear well in the chaotic place [where she] worked."  (R. 110.)  Travers voluntarily quit on May 2, 2008, the alleged onset date of her disability, and has not worked since.  (R. 28-29, 32, 91, 106, 110, 142.)

According to Travers, her doctor did not want to operate on her right ear, which had no eardrum and was perforated.  (R. 30.)  Travers' doctor instructed her to keep water out of both ears and to notify him if she had an ear infection.  (R. 30.)  She also was advised to avoid getting wind or water in her ears and to keep them warm.  (R. 31, 33.)  Travers' doctor also told her that she could no longer work as a medical secretary "because it was just too noisy."  (R. 32.)  Travers stated that her hearing condition "makes it difficult . . . around people . . . trying to hear[] . . . especially when it's noisy."  (R. 33; see also R.122.)  Travers tried a hearing aid in her right ear, but it failed because there was "almost no hearing."  (R. 30.)  Travers also tried a hearing aid in her left ear, but

---

[1]     Travers also "lifted boxes from the front end to the storage room or the basement on occasion" and "lifted charts and paperwork daily to file cabinets from reception."  (R. 111, 127-29.)  The heaviest weight she lifted was between ten and twenty pounds.  (R. 111, 127-29.)

[2]     In her disability report, Travers indicated that she had sixty percent hearing loss in her right ear.  (R. 109.)  In a later disability report, Travers noted that her hearing loss had increased to seventy percent.  (R. 137.)

it caused "a lot of . . . distortion and noise." (R. 30-31.) As a result, Travers was no longer using hearing aids. (R. 31.)

Travers lives in a house with her father and brother. (R. 83, 89, 117.) As part of her daily routine, Travers would "help out around the house, prepare some meals, go shopping sometimes, visit with neighbors, sometimes go to the movies, [and] watch some T.V." (R. 118, 121, 122.) Travers' household chores included "laundry, cleaning, dishes, vacuuming, [and] taking out the trash." (R. 120.) Travers prepared breakfast and lunch herself and prepared dinner with her father. (R. 119.) Travers went outside "pretty much daily," and traveled by either walking, riding in a car, riding a bicycle or public transportation. (R. 120.)

Although Travers was "able to function" and care for her personal needs, she had difficulty if people did "not speak loud enough on [her] right side." (R. 118.) Travers acknowledged that she could follow spoken instructions if "spoken to loud enough that [she] can hear what's said." (R. 123.)

**Medical Evidence**

### Dr. David Lawrence

In December 2007, Dr. David Lawrence inserted bilateral ventilating tubes into Travers' ears due to her "history of chronic middle ear infections." (R. 153, 154, 175.) On January 17, 2008, Travers' ability to hear pure tones was within normal limits. (R. 157.) On May 6, 2008, Dr. Lawrence removed the tube from Travers' right ear and found a "large perforation of the right tympanic membrane." (R. 152, 175.) When the perforation still remained in August 2008, Dr. Lawrence noted that it "is very likely that this will require surgical correction at some future date in order to repair the perforation of the eardrum on [the right] side." (R. 175.)

**Dr. Abraham Eviatar**

On November 25, 2008, Travers met with consultative examiner Dr. Abraham Eviatar and reported her "history of recurrent ear infections" and that she had undergone a "myringotomy with placement of ventilating tubes." (R. 161.)  Travers also reported that she did not suffer from tinnitus or dizziness.  (R. 161.)

Dr. Eviatar examined Travers and found that she suffered from "right chronic ear disease with a very large perforation - practically the whole anterior part of the drum is gone." (R. 161.)  Dr. Eviatar also noted that Travers' left ear "shows some retraction of the ear drum," but the remainder of the exam was within normal limits.  (R. 161.)

Dr. Eviatar also conducted a hearing test that revealed "severe mixed hearing loss on the right ear down to 70 decibels for pure tone" and "bone conduction on the right ear is at the level of 45 decibels."  (R. 161, 162.)[3]  Travers' left ear had a speech threshold of 35 decibels with 100%

---

[3]     Pure-tone audiometry ("PTA") is "a behavioral test used to measure hearing sensitivity" in the peripheral and central auditory systems.  See Joe Walter Kutz Jr., MD et al., Audiology Pure-Tone Testing, http://emedicine.medscape.com/article/1822962-overview (last visited on Nov. 2, 2011).  The test measures pure-tone thresholds ("PTT"), indicating the softest sound audible to an individual at least 50% of the time.  Id.  A PTT between 0 to 25 decibels (dB) indicates normal hearing; 26 to 40 dB indicates mild hearing loss; 41 to 55 dB indicates moderate hearing loss; 56 to 70 dB indicates moderate-severe hearing loss; 71 to 90 dB indicates severe hearing loss; 90 dB and above indicates profound hearing loss.  Id.  A "bone conduction" PTA bypasses the outside and middle areas of the ear and tests the inner ear directly by transmitting sounds via direct vibration of the mastoid bone.  http://www.audiologyawareness.com/hearinfo_heartest.asp (last visited on Nov. 2, 2011.)  In contrast,  an "air conduction" PTA "evaluate[s] the sensitivity of the entire hearing organ" by transmitting sounds through earphones placed over the ears or inserted into the ear canal.  Id.

6

speech discrimination scores.  (R. 161-62.)[4/]  Dr. Eviatar noted that successful surgery on Travers'

right ear "should bring the hearing up to 45 decibels and a hearing aid would still be required to

achieve better hearing." (R. 161.)  Even without surgery, Travers could improve hearing in her right

ear to 40 decibels by wearing a hearing aid.  (R. 161.)  Dr. Eviatar further noted that Travers' left

ear "would also benefit by amplification bringing the hearing back to normal." (R. 161.)

### Audiologist Katie Benant

On January 27, 2009, audiologist Katie Benant performed a hearing test on Travers

and reported a speech reception threshold of 45 decibels in her left ear and 80/20 in her right ear.

(R. 176.)  Travers had a word recognition score of 100% in her left ear and 58% in her right ear.

(R. 176.)  Benant evaluated Travers as having mild to moderate hearing loss in her left ear and

"mixed [hearing loss] rising to severe" in her right ear.  (R. 176.)

### Medical Tests

On March 16, 2009, Travers had a CT scan performed on her temporal lobes, which

revealed "[m]ild chronic bilateral mastoiditis." (R. 179.)  In addition, an August 6, 2009 MRI of

Travers' brain found "[p]aranasal sinus disease" and "[b]ilateral parietal region probable early

atrophy," but "[n]o evidence to suggest acute mastoiditis." (R. 178.)

### Dr. Joseph G. Feghali

Otolaryngologist Dr. Joseph G. Feghali examined Travers and sent an August 19,

2009 letter to Travers' primary care physician Dr. Lucille Van Hook reporting that, in addition to

---

[4/]    Speech discrimination (currently called "word recognition") "is the ability to repeat correctly
an open set of monosyllabic words at suprathreshold intensity."  Kutz, supra n.4.

hearing loss in her right ear, Travers' hearing in her left ear was "dropping even though she had no infections or perforation." (R. 180.) Dr. Feghali noted that Travers' Lyme titer was elevated and that her left hearing loss was "possibly related to Lyme disease." (R. 180.) Although the hearing in Travers' left ear had improved ten decibels since the last visit, Dr. Feghali believed that Travers might have "'neuro-Lyme'" that would require weeks of intravenous antibiotics. (R. 180.)

Dr. Feghali noted that the hearing in Travers' right ear remained "poor," but recommended "holding off on any surgery" because her "hearing might be changing over the coming months" and surgery would "not improve the hearing to a significant or aidable level at this time." (R. 180.) Dr. Feghali further noted that the "only advantage to surgery would be the closure of the right TM perforation and the elimination of the need for water precautions." (R. 180.) Dr. Feghali instructed Travers to continue taking oral medications. (R. 180.)

After a follow-up visit in October 2009, Dr. Feghali reported that Travers' hearing in her left ear was more or less stable since the last visit, but her right ear hearing remained poor. (R. 182.) Dr. Feghali noted that the tympanic membrane perforation in Travers' right ear was infected and had purulent discharge. (R. 182.) Dr. Feghali again recommended holding off surgery on Travers' right ear, but noted that Travers could start using a hearing aid for the right ear if there was "no evidence of cholesteatoma." (R. 182.)[5]

After a hearing test on March 16, 2010, Dr. Feghali reported that Travers had "severe mixed hearing loss with a pure tone average of 80 dB for the right ear and a mild sloping to

---

[5]     Cholesteatoma is a "cystlike mass or benign tumor" that is common in the middle ear and mastoid area "secondary to trauma or infection that heals improperly." Dorland's Illustrated Medical Dictionary 356 (31st ed. 2007).

moderate sensorineural hearing loss with pure tone average of 45 dB for the left ear." (R. 188, 189.)

Dr. Feghali stated that Travers' hearing loss prevented her from continuing her job as a medical

receptionist:

> The degree of severity of her hearing loss prevents her from returning to work and
> carrying out her duties.  She is not able to hear on the office phones and can not hear
> in a noisy office.  The use of a hearing aid for the left ear resulted in distortion of
> sound and was not beneficial.  A hearing aid is not indicated for the right ear due to
> the severity of the hearing loss, poor speech discrimination and presence of a
> perforated tympanic membrane with occasional drainage.

(R. 188.)

### Dr. Lucille Van Hook

In a March 3, 2010 note, Travers' primary care treating physician, Dr. Lucille Van

Hook, reported that Travers had "severe" hearing loss, a large perforation of her right tympanic

membrane and osteoporosis.  (R. 144, 186.)  Dr. Van Hook opined that it would be "very difficult

for [Travers] to work as a receptionist" even with bilateral hearing aids.  (R. 186.)

### Vocational Expert Testimony

Vocational expert Jennifer Dizon testified at Travers' March 23, 2010 hearing.  (R.

33-36.)  Dizon considered whether a hypothetical individual with Travers' age (36), education (12th

grade with "some additional training after that") and hearing loss ("total hearing loss in her right ear

and then partial hearing loss in her left ear and cannot be exposed to constant noise") could work

as a medical receptionist/office assistant.  (R. 34.)  Dizon testified that the individual could not work

in a doctor's office "where there's constant people," but could work as a general office clerk  doing

clerical duties such as typing, billing and mailing.  (R. 34-35.)  Dizon noted that there were

2,906,600 such jobs in the national economy and 100,410 in the New York City area.  (R. 35.)

Dizon further testified that the person could also work as a data entry clerk, with 272,810 jobs in the national economy and 10,530 jobs in the New York City area.  (R. 35.)

**The ALJ's Decision**

On April 21, 2010, ALJ Mittleman denied Travers' application for SSI and DIB benefits in a written decision.  (R. 6-17.)  ALJ Mittleman reviewed Travers' claim of disability resulting from her hearing loss, considering both Travers' testimony and medical records.  (R. 10-14.)

ALJ Mittleman found that Travers had the "residual functional capacity to perform a full range of work at all exertional levels," but that Travers' residual functional capacity had "nonexertional limitations," namely "total hearing loss of the right ear, partial hearing loss of the left ear, and no exposure to constant noise."  (R. 12.)  Despite these limitations, Travers "was able to communicate sufficiently" during the hearing before ALJ Mittleman.  (R. 14.)

ALJ Mittleman recognized the findings of Dr. Feghali and audiologist Rebecca Bieker that Travers would not benefit from hearing aids and could not return to work because she was "unable to hear on office phones and cannot hear in a noisy office."  (R. 14.)  ALJ Mittleman also accepted Dr. Van Hook's opinion that, "even with bilateral hearing aids, [Travers'] 'hearing deficit makes it very difficult for her to work as a receptionist.'" (R. 14.)[6]

---

[6]    ALJ Mittleman "assign[ed] little weight" to Dr. Eviatar's opinions that Travers should have surgery on her right ear and use hearing aides in both ears (see page 6 above), noting that Dr. Eviatar examined Travers only once, that her treating physician recommended holding off surgery and that previous use of hearing aids were not beneficial (R. 14).

ALJ Mittleman applied the appropriate five step legal analysis (see R. 10-11), as follows:  First, ALJ Mittleman found that Travers had not "engaged in substantial gainful activity since May 2, 2008, the alleged onset date."  (R. 11.)  Second, ALJ Mittleman determined that Travers had a "severe impairment" of "right tympanic membrane perforation with poor hearing, and left hearing loss."  (R. 11.)  Third, ALJ Mittleman found that Travers did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments," i.e., Listing 2.08.  (R. 12.)  Fourth, ALJ Mittleman determined that Travers was "unable to perform any past relevant work."  (R. 15.)  At the last step, ALJ Mittleman found that, considering Travers' "age, education, work experience, and residual functional capacity, [Travers] has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy."  (R. 15-16.)  ALJ Mittleman concluded that Travers was not "under a disability, as defined in the Social Security Act, from May 2, 2008, through the date of [the] decision," i.e., April 21, 2010.  (R. 16-17.)

ALJ Mittleman's decision became the final decision of the Commissioner when the Appeals Council denied review on October 13, 2010.  (R. 1-3.)

## ANALYSIS

## I.    THE APPLICABLE LAW

### A.    Definition of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart

v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Salmini v. Comm'r of Soc. Sec., 371

F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir.

2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart,

163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts

v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir.

2005).[7]

> An individual shall be determined to be under a disability only if [the combined
> effects of] his physical or mental impairment or impairments are of such severity that
> he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for him,
> or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23,

124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of

Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v.

Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[8]

---

[7]   See also, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v.
Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir.
2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62
(2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168
F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v.
Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[8]   See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77;
(continued...)

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[9/]

### B.    Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination.  E.g., 42 U.S.C. § 405(g); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[10/]  "'Thus, the role of the district

---

[8/]    (...continued)
Balsamo v. Chater, 142 F.3d at 79.

[9/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[10/]    See also, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36 F. App'x 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v. Barnhart, 29 F. App'x 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[11]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Comins v. Astrue, 374 F. App'x 147, 149 (2d Cir. 2010); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[12] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[13] However, the Court will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ.

---

[11]    See also, e.g., Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[12]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[13]    See also, e.g., Colling v. Barnhart, 254 F. App'x 87, 88 (2d Cir. 2007); Veino v. Barnhart, 312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996).

4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Butts v.

Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005);

Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in

evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income).  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  §§ 404.1520(b), 416.920(b).  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

15

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[14] accord, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111-12; Williams v. Comm'r of Soc. Sec., 236 F. App'x 641, 643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[15]

       The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[16]

---

[14]    Amendments to 20 C.F.R. § 404.1520 became effective September 25, 2003.  See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2.  The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively.  20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156.  The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairment, the SSA will assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work.  See 68 Fed. Reg. 51156.

[15]    See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barhnart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[16]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 112; Williams v. Comm'r of Soc. Sec., 236 F. App'x at 643; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

II.   **APPLICATION OF THE FIVE-STEP SEQUENCE TO TRAVERS' CLAIMS**

    A.   **Travers Was Not Engaged in Substantial Gainful Activity**

           The first inquiry is whether Travers was engaged in substantial gainful activity after her application for SSI and DIB benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  ALJ Mittleman's conclusion that Travers had not engaged in substantial gainful activity during the applicable time period (see page 10 above) favors Travers. The Court therefore proceeds to the second step of the five-step analysis.

    B.   **Travers Demonstrated A "Severe" Physical Impairment That Significantly Limited Her Ability To Do Basic Work Activities**

           The second step of the analysis is to determine whether Travers proved that she had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . .[u]nderstanding, carrying out, and remembering simple instructions . . .[u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

           "A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential

evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

   "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

   ALJ Mittleman determined that the medical evidence indicated that Travers had a "severe impairment," that is, "right tympanic membrane perforation with poor hearing, and left hearing loss." (See page 10 above.)  Moreover, ALJ Mittleman found that this impairment "cause[d] more than minimal functional limitations in [Travers'] ability to perform basic work activities." (R. 11.)  This finding benefits Travers.  The Court therefore proceeds to the third step of the five-step analysis.

  C. **Travers Did Not Have A Disability Listed in Appendix 1 of the Regulations**

   The third step of the five-step test requires a determination of whether Travers had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Mittleman found that Travers did not have an "impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 12; see page 10 above.)  ALJ Mittleman determined that Travers failed to satisfy former listing 2.08, "Hearing impairments (hearing not restorable by a hearing aid)," which required:

> A.  Average hearing threshold sensitivity for air conduction of 90 decibels or greater and for bone conduction to corresponding maximal levels, in the better ear, . . . ; or
>
> B.  Speech discrimination scores of 40 percent or less in the better ear.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 2.08 (as effective until Aug. 1, 2010).  The hearing in Travers' left (or better) ear was tested several times and had a speech threshold of between 35 dB to 45 dB with 100% speech discrimination scores.  (See pages 5-6 above.)  Consequently, ALJ Mittleman correctly found that the "medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination."  (R. 12.)[17]

---

[17]  Travers fares no better under the current listings that require either:

> A.  An average air conduction hearing threshold of 90 decibels or greater in the better ear and an average bone conduction hearing threshold of 60 decibels or greater in the better ear.
>
> OR
>
> B.  A word recognition score of 40 percent or less in the better ear determined using a standardized list of phonetically balanced monosyllabic words.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 2.10 (as effective July 23, 2011) (citations omitted).

**D.**     **Travers Did Not Have the Ability to Perform Her Past Relevant Work**

The fourth prong of the five part analysis asks whether Travers had the residual functional capacity to perform her past relevant work.  (See page 10 above.)  Although noting that Travers could still perform office work, ALJ Mittleman found that Travers was unable to perform her past work in a doctor's office because "there would be constant interaction with people." (R. 15.) This finding benefits Travers, so the Court proceeds to the fifth and final step of the analysis.

**E**.     **Travers Could Perform Other Work in the Economy**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); see, e.g., Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). "The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567(a). Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569, Pt. 404 Subpt. P, App. 2, § 200.00(a).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at

605; <u>see also</u>, <u>e.g.</u>, <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing <u>Bapp</u>)); <u>Suarez</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting <u>Zabala</u>)).[18/]

ALJ Mittleman determined that Travers had "the residual functional capacity to perform a full range of work at all exertion levels," but found that she was limited by nonexertional limitations, namely "total hearing loss of the right ear, partial hearing loss of the left ear, and no exposure to constant noise." (<u>See</u> page 9 above). Given that Travers' limitations were nonexertional only, ALJ Mittleman elicited testimony from vocational expert Jennifer Dizon instead of relying on

---

[18/]    Although the Grid is not dispositive in such cases, it still provides a framework to guide the ALJ's decision. <u>See</u>, <u>e.g.</u>, <u>Jones</u> v. <u>Astrue</u>, 09 Civ. 5577, 2011 WL 3423771 at *12 (S.D.N.Y. July 15, 2011) (The Grid "serve[s] as a 'framework' for determining whether a claimant with a nonexertional limitation is disabled."); <u>Clobridge</u> v. <u>Astrue</u>, No. 07-CV-00691, 2010 WL 3909500 at *11 (N.D.N.Y. Sept. 30, 2010) ("If a plaintiff's situation fits well within a particular classification, then resort to the grids is appropriate. If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grids is inappropriate, in which case further evidence and/or testimony is required. In such cases, the ALJ may rely on the grids only as a framework for decision-making." (citations omitted)); <u>Paulino</u> v. <u>Astrue</u>, 08 Civ. 02813, 2010 WL 3001752 at *26 (S.D.N.Y. July 30, 2010) (Peck, M.J.) ("While the Grid is not dispositive in cases where the claimant has nonexertional limits . . . , the Grid certainly serves as a framework to guide the ALJ's decision.").

the Grid.  Dixon testified that there were office clerk and data entry clerk jobs readily available in the national and local economy that a hypothetical individual with Travers' age, education, past work experience and residual functional capacity, including her hearing loss, could perform.  (See pages 8-9 above.)[19]

## CONCLUSION

For the reasons discussed above, the Commissioner's determination that Travers was not disabled within the meaning of the Social Security Act during the period May 2, 2008 to April 21, 2010 is supported by substantial evidence.  Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 11) should be GRANTED.

---

[19]    A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs.  20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d at 103-04; Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 F. App'x 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983); DeJesus v. Astrue, 762 F. Supp. 2d 673, 693 n.20 (S.D.N.Y. 2011) (Peck, M.J.); Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 n.20 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sep. 12, 2006); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

23

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6.[20] Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe, 500 Pearl Street, Room 920, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Gardephe (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:      New York, New York
            November 2, 2011

Respectfully submitted,

**Andrew J. Peck**
United States Magistrate Judge

Copies to:   Lori S. Travers (Regular & Certified Mail)
             Susan C. Branagan, Esq.
             Judge Paul G. Gardephe

---

[20]   If the pro se plaintiff requires copies of any of the cases reported only in Westlaw, petitioner should request copies from opposing counsel. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.